**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DONNA LYNN FORTNER,**

**Plaintiff,**

**v.** **Case No.: 3:11-cv-00585**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration,**

**Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned recommends that the Commissioner's motion be granted, that plaintiff's motion be denied, and that this

case be dismissed, with prejudice, and removed from the docket of the Court.

## I. **Procedural History**

Plaintiff, Donna Lynn Fortner (hereinafter "Claimant"), filed applications for DIB on May 14, 2009 and SSI on January 13, 2010, alleging a disability onset date of May 2, 2006.[1] (Tr. at 114, 119). Claimant reported difficulty due to swollen feet and aching legs, (Tr. at 165, 170, 172), sleep walking and related injuries, (Tr. at 166, 171, 172), and falling asleep suddenly during the day. (Tr. at 168, 169, 170, 172). The Social Security Administration (hereinafter "SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 53-54, 56-58). Claimant filed a request for an administrative hearing, which was held on November 12, 2010 before the Honorable Charlie P. Andrus, Administrative Law Judge (hereinafter "ALJ"). (Tr. at 26-46). By written decision dated March 3, 2011, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 13–21). The ALJ's decision became the final decision of the Commissioner on June 23, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. §405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 7, 8, 10, 11). Consequently, the matter is fully briefed and ready for resolution.

## II. **Claimant's Background**

Claimant was 43 and 44 years old at the time she filed her applications for DIB and SSI, respectively, and 45 years old at the time of her administrative hearing. (Tr.

[1] At the hearing before the ALJ, Claimant amended the alleged onset date of her disability to January 15, 2009 to reflect the date she ceased working. (Tr. at 33).

at 30). She completed high school and communicates in English. (Tr. at 31). Claimant has prior work experience as a private sitter at a nursing home, a data entry clerk at Aspen Systems, and a front desk clerk and administrative assistant at a radio station. (Tr. at 162).

Claimant initially alleged that she became unable to work in May 2006 following a leg injury she sustained while sleep walking. (Tr. at 32). However, she did not cease working until January 2009. (Tr. at 33). In June 2010, Claimant sought treatment for her sleep problems, (Tr. at 298), was subsequently diagnosed with obstructive sleep apnea, and began using a CPAP machine. (Tr. at 318, 325).

## III. Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether

this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

In the present action, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2013. (Tr. at 15, Finding No 1). At the first step of the sequential evaluation, the

ALJ confirmed that Claimant had not engaged in substantial gainful activity since the time of the alleged onset of disability.[2] (*Id.*, Finding No. 2). At the second step, the ALJ determined that Claimant had the following severe impairments: "sleep apnea and residuals of right ankle fracture." (*Id.*, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had the residual functional capacity to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she should only occasionally climb, balance, stoop, crouch, kneel or crawl. The claimant should avoid work that would subject her to vibration, dust, fumes, height, or dangerous machinery.

(Tr. at 16-19, Finding No. 5). Under the fourth step, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC and determined that Claimant was capable of performing past relevant work. (Tr. at 19, Finding No. 6). With the assistance of a vocational expert, the ALJ made alternative findings under Step 5 of the sequential evaluation process, determining that Claimant could perform jobs at the light and sedentary exertional levels, which were available in significant numbers in the national economy. (Tr. at 19-21). At the light exertional level, the ALJ found that Claimant was capable of performing the jobs of counter clerk, clerical worker, and inspector. (Tr. at 20). At the sedentary level, the ALJ found that Claimant could work as a telephone order clerk, machine monitor, and clerical worker. (*Id.*). Therefore, the ALJ concluded that Claimant was not disabled and, thus,

---

[2] Although the ALJ lists May 2, 2006 as the alleged onset date, this appears to be a typographical error as he later notes in his decision that Claimant amended her alleged onset date at the hearing to January 15, 2009 to reflect the date she ceased working. (Tr. at 17, 33).

was not entitled to benefits. (Tr. at 21, Finding No. 7).

## IV. Claimant's Challenges to the Commissioner's Decision

Claimant raises two main challenges to the Commissioner's decision. First, Claimant argues that the ALJ "failed in his duty of minimal articulation" by failing to address her obesity and by ignoring the opinions of Claimant's sleep apnea treatment providers in determining her RFC. (ECF No. 10 at 10-15). Second, Claimant contends that the ALJ, having found that her sleep apnea improved after July 2010, should have separately considered Claimant's limitations prior to July 2010. (*Id.* at 15).

## V. Relevant Evidence

The undersigned has reviewed the Transcript of Proceedings in its entirety, including all of the medical records, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute.

### A. Treatment Records Relating to Claimant's Alleged Impairments

#### *1. 2006 – 2009 Emergency Room Treatment Records*

Claimant reported that she initially injured her ankles on May 2, 2006 during an episode of sleepwalking, but the record does not contain any treatment notes from this incident. (Tr. at 32). On September 22, 2006, Claimant sought medical treatment from Scott Orthopedic Center after she "fell out of bed, heard a loud crunch and had pain up her left leg."[3] (Tr. at 216). Dr. Kyle R. Hegg, M.D. assessed Claimant with closed fractures of the second, third, and fourth metatarsal bones and put her leg in a cast. (Tr. at 216). On October 6, 2006, Claimant had a follow-up examination, which Dr. Hegg indicated was "normal and show[ed] no problems." (Tr. at 214). On

---

[3] The record indicates that Claimant was initially treated at the Cabell Huntington Hospital Emergency Room. (Tr. at 216). However, those records are not included in the transcript.

October, 24, 2006, the cast was removed. (Tr. at 212). On November 1, 2006, Claimant called Scott Orthopedic Center to complain that "her foot has been swollen every day since the cast came off." (Tr. at 211). Claimant apparently scheduled an office visit for November 3, 2006, but the record does not contain any subsequent records on the matter. (*Id.*).

In January 2008, Claimant sought emergency medical treatment at St. Mary's Medical Center for her right ankle, reporting that her granddaughter had fallen on her ankle. (Tr. at 218-24). In February 2008, Claimant sought emergency medical treatment from Cabell Huntington Hospital for bronchitis. (Tr. at 225-63). Both issues apparently resolved themselves without requiring further medical attention.

On January 4, 2009, Claimant sought emergency medical treatment at Cabell Huntington Hospital after having tripped and fallen near her home. (Tr. at 267). She was diagnosed with a "closed tib-fib fracture" of her left leg and treated with a cast. (Tr. at 267, 269). Claimant was discharged the following day. (Tr. at 264). On January 13, 2009, Claimant returned to Cabell Huntington Hospital complaining of left leg pain and swelling. (Tr. at 278-94). The treatment provider prescribed acetaminophen-oxycodone and provided Claimant with educational materials. (Tr. at 279). Claimant was discharged later that day. (Tr. at 280).

***2. 2010 University Physicians & Surgeons Treatment Records***

On June 2, 2010, Claimant met with Dr. Sydnee McElroy, M.D. at University Physicians & Surgeons to establish primary care and schedule a sleep study. (Tr. at 298). Dr. McElroy conducted a physical examination, which revealed no abnormalities, although Claimant did complain of fatigue. (Tr. at 299-300). Dr. McElroy ordered a sleep study and laboratory tests "to rule out other disease

processes." (Tr. at 301).

On June 10, 2010, Claimant underwent an Overnight Polysomnographic Study performed by Dr. Imran Khawaja. (Tr. at 324-26). Dr. Khawaja described Claimant as "a 44-year-old female who stands 62 inches tall and weighs 196 pounds with a BMI of 36." (Tr. at 324). Throughout the entire night, Claimant had "495 episodes of apneas and 149 episodes of partial obstructive hypopneas with an overall AHI of 110 events per hour." (*Id.*). Based on the results of the sleep study, Dr. Khawaja diagnosed Claimant with "very severe obstructive sleep apnea syndrome." (Tr. at 325). He recommended that Claimant 1) undergo a second night CPAP nitration study, 2) pursue "weight loss close to ideal body weight," 3) be evaluated for reversible causes of upper airway obstruction, 4) refrain from sedatives, hypnotics, and other central nervous system depressants, particularly prior to bedtime, 5) sleep on her side and keep her head elevated, and 6) "refrain from driving or operating any hazardous machinery." (*Id.*).

On June 23, 2010, Claimant met with Dr. Khawaja to review the results of the sleep study. (Tr. at 320-22). They discussed "the pathology of [obstructive sleep apnea] and the health risks including heart disease, hypertension, CVA [stroke], daytime sleepiness, risk for accidents and difficulty with tasks of vigilance." (Tr. at 322). Dr. Khawaja assessed Claimant with obstructive sleep apnea, ordered a second sleep study, and recommended that Claimant lose weight, sleep on her side, and stop smoking. (*Id.*).

On July 12, 2010, Claimant underwent an overnight CPAP titration study. (Tr. at 317). When using a CPAP machine, Claimant had an overall AHI of 13 events per hour, compared to her baseline of 110 events per hour. (Tr. at 318). Based on the

results of the sleep study, Dr. Khawaja diagnosed Claimant with severe obstructive sleep apnea with optimal CPAP titration. (*Id.*). He recommended that Claimant start using a CPAP machine and reiterated his prior recommendations that she sleep on her side with her head elevated, pursue weight loss, refrain from using certain medications, and avoid driving and operating hazardous machinery. (Tr. at 318-19).

On August 10, 2010, Claimant met with Dr. McElroy regarding hypothyroidism and sleep apnea. (Tr. at 295). Claimant reported feeling fatigued, but that "she feels like she is sleeping better" and that "her daytime sleepiness is not as bad as it used to be." (*Id.*). Claimant also complained of aching leg pain that began "after walking for awhile," and eased "after she sits and props her legs up for awhile." (*Id.*). Claimant's physical examination yielded no abnormalities. (Tr. at 295-96). Dr. McElroy assessed Claimant with hypothyroidism and obstructive sleep apnea. (Tr. at 297). She noted that Claimant's obstructive sleep apnea was "improved with use of CPAP." (*Id.*). Regarding Claimant's leg pain, Dr. McElroy ordered an ankle-brachial index test (ABI) "to ensure that there is no [peripheral vascular disease]." (*Id.*).

On August 24, 2010, Claimant underwent testing to address her complaints of "bilateral rest pain and bilateral claudication symptoms." (Tr. at 302). According to the test results dated September 4, 2010, there was "no suggestion that the patient has any major atherosclerotic narrowing bilaterally," but there was "some suggestion that there may be some narrowing in the thigh such as in the superficial femoral arteries on the right." (Tr. at 304). Based upon this assessment, the report concluded that "if clinical evidence is compelling, the patient could have [a] CT angiogram of the abdominal aorta with bilateral femoral runoff for better diagnostic evaluation." (*Id.*). The record does not contain further treatment notes regarding this condition.

On September 8, 2010, Dr. Khawaja conducted a physical examination of Claimant, which reflected no abnormalities in Claimant's general appearance, ears, nose, upper airway, pharynx, lymph nodes, chest, lungs, cardiovascular system, or abdomen. (Tr. at 315). He assessed Claimant with obstructive sleep apnea and ordered a follow-up visit for six months later. (Tr. at 316). Dr. Khawaja discussed with Claimant "the pathology of obstructive sleep apnea and the health risks including heart disease, hypertension, CVA [stroke], daytime sleepiness, risk for accidents and difficulty with tasks of vigilance," as well as use of the CPAP machine and "other treatment modalities including weight loss." (*Id.*).

**B. Consulting Medical Source Evaluations**

On October 20, 2009, Dr. Kip Beard, M.D. performed an internal medicine examination of Claimant at the request of Disability Determination Services. (Tr. at 196-201). Dr. Beard documented Claimant's primary complaints as "leg injuries due to sleepwalking and sleep apnea." (Tr. at 196). Claimant provided history regarding her current impairments, reporting three prior injuries to her legs and ankles, the most recent of which occurred in January 2009. (*Id.*). Claimant complained of constant bilateral ankle pain, swelling in her ankles and feet, and left shin pain. (*Id.*). She also reported that an Emergency Department physician had observed her snoring and alerted her to the possibility that she had sleep apnea although she had yet to be assessed or treated for sleep apnea. (Tr. at 197). She advised Dr. Beard that she could fall asleep during the day, even when in the midst of a conversation, and also had fallen asleep at work. Dr. Beard then reviewed Claimant's past medical, surgical, and social histories, and conducted a review of systems, in which Claimant reported no abnormalities in her pulmonary, cardiovascular, gastrointestinal, genitourinary, or

neurological systems. (Tr. at 197-98).

Dr. Beard conducted a physical examination of Claimant. (Tr. at 198-200). He described Claimant as "a 44-year-old, obese female who presents without ambulatory aids and did not require them." (Tr. at 198). He observed that Claimant's "gait was mildly limping on the right due to some ankle pain" but that "it was not unsteady and not unpredictable." (*Id.*). Furthermore, Claimant "could stand unassisted," and "could arise from a seat and step up and down from the examination table." (*Id.*). Dr. Beard found no abnormalities in Claimant's HEENT (head, ears, eyes, nose and throat), chest and lungs, cardiovascular system, abdomen, extremities, cervical spine, arms, hands, lumbosacral spine/hips, or neurological system. (Tr. at 198-200). Dr. Beard observed "some mild pain with motion testing" and "some mild tenderness" in Claimant's left knee, but "no redness, warmth, swelling, effusion, or obvious significant crepitus with normal motion." (Tr. at 199). Claimant's right ankle revealed "well-healed surgical scars," and "some mild bony prominence increased when compared to the left side." (*Id.*). Dr. Beard noted "some mild pain with motion testing" and "some mild tenderness at the ankle with normal motion" but otherwise found "no obvious significant swelling" and "no redness or warmth." (*Id.*). As for Claimant's left ankle, Dr. Beard observed "some mild pain with tenderness" but again found "no swelling, redness, or warmth with normal motion." (*Id.*).

Dr. Beard's diagnostic impression was that Claimant suffered from "right foot fracture"; "right ankle fracture, status post open reduction and internal fixation," with a note to "consider posttraumatic osteoarthrosis or pain related to hardware"; "left ankle and apparent proximal tibia fracture, according to provided history with ongoing pain"; "possible obstructive sleep apnea"; "sleepwalking, according to

history"; and obesity. (Tr. at 200). The accompanying X-Ray Report completed by Dr. Eli Rubenstein, M.D. confirmed that both "the ankle mortise is normal" and "the talus and calcaneus are normal." (Tr. at 201). Dr. Rubenstein's impression indicates an "old fracture bilaterally of the ankle joint which are *[sic]* well healed." (*Id.*).

Based upon Dr. Beard's findings, Dr. A. Rafael Gomez completed a Physical Residual Functional Capacity Assessment form on November 10, 2009. (Tr. at 202-09). Dr. Gomez found that Claimant could occasionally lift/carry 20 pounds and frequently lift/carry up to 10 pounds. (Tr. at 203). Claimant could stand or walk six hours a day; sit for six hours a day; and was unlimited in her ability to push or pull. (*Id.*). Claimant's postural limitations allowed only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. at 204). Dr. Gomez found that Claimant was not subject to any manipulative, visual, or communicative limitations. (*Id.* at 205-06). He did impose environmental limitations on Claimant to avoid concentrated exposure to vibration, fumes, and hazards. (Tr. at 206). Dr. Gomez commented that "Claimant is not fully credible" as "[s]ome of her allegations are not supported by the medical findings." (Tr. at 207). However, Dr. Gomez nevertheless recommended that Claimant's capacity be "reduced to light work." (*Id.*).

## VI. Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is

> evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. Analysis

Having thoroughly considered the evidence and the arguments of counsel, the undersigned rejects Claimant's challenges as lacking merit. Additionally, the undersigned **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

### A. ALJ's Treatment of Claimant's Obesity, Sleep Apnea, and Claudication

According to Claimant, the ALJ failed in his "duty of minimal articulation." Specifically, Claimant contends that the ALJ (1) "failed to address the issue of obesity at any stage of his evaluation of the case;" (2) improperly determined that Claimant could do light work by "refusing to consider that the findings of the sleep study supported her complaints;" (3) made "no reference to Dr. Khawaja's name," although

he was her obstructive sleep apnea treatment provider; and (4) failed to address Dr. McElroy's diagnosis of claudication and statements regarding the arteries in her legs. (ECF No. 10 at 10-15).

The Commissioner disagrees, arguing that (1) throughout the entire administrative process, Claimant never mentioned obesity as an impairment until after seeking judicial review of the Commissioner's decision and neither Claimant nor any of her treating or examining doctors had ever suggested that her obesity was debilitating; (2) the ALJ's RFC assessment, which limited Claimant to light work, was both consistent with the state agency physician's opinion and uncontradicted by any other physician's opinion as to Claimant's limitations; (3) the ALJ did in fact carefully consider Dr. Khawaja's treatment notes and findings, as evidenced by his finding that Claimant's sleep apnea was a severe impairment; and (4) Dr. McElroy did not diagnose Claimant with claudication. (ECF No. 11 at 10-13). The Commissioner also argues that Claimant has "failed to indicate how any possible narrowing in the femoral artery rendered her unable to work." (*Id.* at 13). Finally, the Commissioner contends that substantial evidence supports the ALJ's finding that Claimant was not disabled, even prior to July 2010. (*Id.*).

***1. Consideration of Claimant's Obesity***

Social Security Ruling 02-1p requires the ALJ to consider Claimant's obesity when evaluating: whether she has a medically determinable impairment and whether it is severe (Step 2); whether her impairments meet or equal the requirements of a listed impairment (Step 3); and whether her impairments prevent her from doing past relevant or other work (Steps 4 and 5). SSR 02-1p, 2002 WL 3468281 at *3. At Step 2, an ALJ "will accept a diagnosis of obesity given by a treating source or by a

consultative examiner," but obesity will only be considered a "'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment, it significantly limits an individual's physical or mental ability to do basic work activities." *Id.* at *4. At Step 3, the ALJ "will not make assumptions about the severity or functional effects of obesity combined with other impairments," but rather, "will evaluate each case based on the information in the case record." *Id.* at *5-6. At Steps 4 and 5, the ALJ will assess "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." *Id.* at *6. Generally, an ALJ's failure "to meaningfully discuss [a claimant's] obesity conflicts with Social Security Ruling 02-1p and warrants remand." *Winston v. Astrue*, 2012 WL 4086448 *4 (E.D.N.C. Sept. 17, 2012). Nonetheless, there are exceptions to this general rule. For example, remand is not warranted when an ALJ erroneously fails to find obesity to be a severe impairment so long as other impairments are deemed severe and obesity is subsequently considered. *Id.* (collecting cases). Similarly, an ALJ's failure to explicitly evaluate the impact of a claimant's obesity is harmless error "when the record does not show that the obesity impaired the claimant's ability to work." *Id.* (collecting cases). Finally, remand is unnecessary when the ALJ relies upon medical records or opinions of physicians who were aware of the claimant's obesity when preparing the relevant documents or offering the opinions. *Id.* (collecting cases).

In this case, the ALJ acknowledged the existence of Claimant's obesity but did not specifically address it at Steps 2 and 3 of the sequential evaluation process and only briefly mentioned it when determining Claimant's RFC for use at Steps 4 and 5. However, the ALJ's failure to more fully articulate his consideration of Claimant's

obesity does not merit remand for two reasons. First, the ALJ's rationale for declining to find Claimant's obesity to be a severe impairment is obvious. Quite simply, nothing in the record suggested that Claimant was impaired by her weight. Several doctors noted that Claimant was obese: Dr. Beard described Claimant as "a 44-year-old, obese female" and diagnosed her with obesity (Tr. at 198, 200); Dr. Gomez's secondary diagnosis of Claimant was for "Obesity Level II." (Tr. at 202); and Dr. Khawaja consistently recommended that Claimant lose weight to ease the effects of her sleep apnea. (Tr. at 316, 319, 321, 322, 325). However, the record is entirely devoid of any notation or testimony suggesting that Claimant's weight impacted her ability to engage in work-related activities or activities of daily living. Claimant (1) never sought treatment for or made complaints to a medical treatment provider about her weight, (Tr. at 211-326); (2) never identified obesity as an impairment nor described limitations related to her weight in the Adult Function Reports or in response to any other agency inquiries, (Tr. at 146-64, 165-72, 173-89); and (3) did not offer any testimony at the administrative hearing regarding her obesity or its limiting effects. (Tr. at 28-47). Moreover, at Step 2, the ALJ found Claimant's primary impairments of status post-leg fracture and obstructive sleep apnea to be severe; thus, moving on to Step 3 in the sequential evaluation.

Claimant's assertion that the ALJ performed only a perfunctory comparison of her impairments, including obesity, with the severity criteria of applicable listed impairments is also unavailing. (ECF No. 10 at 11-12). In determining that Claimant's impairments did not meet or medically equal any of those in the Listing, the ALJ relied heavily on Dr. Beard's medical examination. (Tr. at 16). Despite diagnosing Claimant with obesity, (Tr. at 200), Dr. Beard nevertheless found no abnormalities in

Claimant's pulmonary and cardiovascular systems, (Tr. at 198), thereby ruling out impairments listed under Sections 3.00 and 4.00. Likewise, Dr. Beard observed only mild pain and tenderness in Claimant's ankles and left knee and found no redness, warmth, swelling, or other signs and symptoms of sufficient severity to meet or medically equal the criteria of the impairments listed in Section 1.00. (Tr. at 199). Subsequent physical examinations performed by Dr. McElroy and Dr. Khawaja were similarly unexceptional. (Tr. at 299-300, 315). Dr. Khawaja strongly recommended "weight loss close to ideal body weight," apparently as a treatment modality for Claimant's already documented sleep apnea, but he failed to identify any specific obesity-related symptoms or limitations. (Tr. at 316, 319, 321, 322, 325). To the extent that Claimant's obesity may have exacerbated her sleep apnea, Claimant fails to identify any severity criteria associated with the exacerbation beyond those already documented in the record and rejected by the ALJ as insufficient to meet or equal the Listing.

Furthermore, at later steps of the sequential evaluation, the ALJ clearly incorporated in his conclusions the records and opinions generated by physicians who were aware of Claimant's obesity. When crafting Claimant's RFC for use at Steps 4 and 5 of the process, the ALJ discussed and relied on Dr. Gomez's RFC opinion, Claimant's own testimony, the medical examinations performed by Dr. Beard and Dr. McElroy, and the test results reported by Dr. Khwaja. (Tr. at 16-18). Dr. Gomez, who diagnosed Claimant with Obesity Level II, recommended a number of postural and environmental limitations, (Tr. at 202-09), which the ALJ largely adopted. (Tr. at 16, 18). Claimant herself did not testify to any obesity-related restrictions, nor did the examinations of Dr. Beard or Dr. McElroy reflect any such limitations. (Tr. at 299-

300, 315). Dr. Khwaja's testing showed remarkable improvement in Claimant's sleep apnea with the use of a CPAP machine regardless of her weight. (Tr. at 317-19). To the contrary, Claimant fails to offer even a scintilla of evidence to substantiate the existence of other obesity-related limitations that were not adequately accounted for by the ALJ in his analysis of Claimant's obstructive sleep apnea and musculoskeletal condition. (Pl.'s Br. at 10-13). In the absence of some evidence that a more robust evaluation of Claimant's obesity might reasonably have changed the outcome of the disability determination, remand simply is not warranted. *See Burch v. Astrue*, 2011 WL 4025450 (W.D.N.C., July 5, 2011), *citing Camp v. Massanari,* 22 Fed.Appx. 311 (4th Cir.2001) (claimant must show that absent error, the decision might have been different); *see also Rutherford v. Barnhart,* 399 F.3d 546, 551-21 (3rd Cir. 2005); *Skarbeck v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). For these reasons, the undersigned **FINDS** that the ALJ's failure to more fully articulate the effect of Claimant's obesity on her ability to perform work-related activities was harmless error and does not require a remand of the final decision.

***2. Consideration of the Sleep Studies***

Claimant argues that the ALJ "refused to consider that the findings of the sleep study supported her prior complaints." (Pl.'s Br. at 13). In Claimant's view, the ALJ's reliance on Dr. Gomez's RFC opinion was misplaced, as Dr. Gomez incorrectly determined "that the Claimant could not be found credible because there was a lack of medical evidence to support her allegations." (*Id.*). Claimant argues that the subsequent sleep study conducted in June 2010 supported her complaints of daytime sleepiness, fear of falling asleep behind the wheel, and other sleep-related allegations. (*Id.*). Claimant also contends that the results of the sleep study "directly contradict

the ALJ's assumption that after starting treatment with the CPAP machine that the Claimant did not have any further limitations related to the impairment." (Pl.'s Br. at 14). In support of this argument, Claimant points to Dr. Khawaja's finding that Claimant had "a very severe degree of obstructive sleep apnea syndrome," his recommendation that she avoid driving and operating machinery, and his discussion of health risks related to obstructive sleep apnea. (Pl.'s Br. at 13-14). Contrary to Claimant's belief, however, the ALJ's RFC assessment is supported by substantial evidence.

The ALJ's reliance on Dr. Gomez's RFC opinion was not improper. State agency medical consultants are "highly qualified physicians ... who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i) & 416.927(f)(2)(i); *see also* SSR 96-6p, 1996 WL 374180 at *2. Accordingly, the Regulations "require administrative law judges and the Appeals council to consider their findings of fact about the nature and severity of an individual's impairments as opinions of nonexamining physicians and psychologists." *Id.* at *2. In doing so, the ALJ considers "the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. §§ 404.1527(f)(2)(ii) & 416.927(f)(2)(ii) (Nov. 12, 2010 to June 12, 2011). While the ALJ is not bound by the State agency physician's findings, he "may not ignore these opinions and must explain the weight given to the opinions" in his decision. SSR 96-6p, 1996 WL 374180 at *2.

Here, Dr. Gomez was the only physician who provided a medical source statement of Claimant's ability to do work-related activities. (Tr. at 18). Based upon

his analysis of the record, including Dr. Beard's examination, Dr. Gomez determined that Claimant was "not fully credible" as "[s]ome of her allegations are not supported by the medical findings." (Tr. at 207). Nevertheless, he "reduced [Claimant] to light work," and recommended certain other postural and environmental limitations. (Tr. at 204-07). It is evident that the ALJ did in fact consider the results of Claimant's sleep study, as he specifically acknowledged that "[t]esting was positive for 'severe obstructive sleep apnea with optimal CPAP titration,'" (Tr. at 18), and included sleep apnea as one of Claimant's severe impairments. (Tr. at 15).

Substantial evidence on the record supports the ALJ's determination that Claimant's sleep apnea did not render her disabled. First, as the ALJ observed, Claimant reported experiencing sleep-related difficulties dating back to 2006. (Tr. at 17, 190, 196, 298). However, she continued to work for over two years following the onset of her sleep problems. (Tr. at 33). Although certainly not dispositive, this undermines Claimant's argument that her sleep apnea prevented her from performing basic work activities. Second, despite Claimant's diagnosis of "severe obstructive sleep apnea," Claimant appears to have benefited from use of a CPAP machine, as she herself reported that "she feels like she is sleeping better" and that her "daytime sleepiness is not as bad as it used to be" since using the CPAP machine. (Tr. at 295). According to the results of an overnight CPAP titration sleep study, Claimant enjoyed a measurable reduction in the number of apneic episodes when using the CPAP machine. (Tr. at 318). Dr. Khawaja documented Claimant's "remarkable" improvement while on the machine, indicating that her nightly episodes decreased from 110 apneic events per hour to 13 events per hour and from 25 episodes of leg movement to none. (*Id.*). Third, as the ALJ noted, "there is no

evidence of recommendation for aggressive treatment for breathing problems." (Tr. at 18). The record reflects only that Dr. Khawaja discussed with Claimant "the pathology of [obstructive sleep apnea] and the health risks including heart disease, hypertension, CVA [stroke], daytime sleepiness, risk for accidents and difficulty with tasks of vigilance." (Tr. at 322). However, there is no indication that Claimant actually suffered from heart disease, hypertension, or stroke. (Tr. 198-99, 299-300). In fact, the only relevant restriction recommended in the sleep studies was for Claimant to "refrain from driving or operating any hazardous machinery." (Tr. at 321). Furthermore, the vocational expert testified that despite her limitations, Claimant could still perform sedentary work at jobs existing in sufficient numbers in the national economy. (Tr. at 41-43).

The ALJ adequately accounted for the results of the sleep studies when determining Claimant's RFC. The ALJ incorporated Dr. Khawaja's recommendations in the RFC by limiting Claimant to light work and imposing additional postural and environmental limitations, including the restriction that Claimant "avoid work that would subject her to ... dangerous machinery." (Tr. at 16). Accordingly, Claimant's challenge to the Commissioner's decision on this ground is unfounded.

In regard to Claimant's credibility, the undersigned acknowledges that Dr. Gomez did not have the results of the sleep studies when he opined that Claimant was less than fully credible. Inasmuch as Dr. Gomez did not elaborate on this statement, it is impossible to discern which particular claims Dr. Gomez felt were exaggerated and what additional medical findings he believed would have corroborated Claimant's allegations. Regardless, the ALJ conducted his own credibility analysis, which was based on a review of all of the evidence, including the

sleep studies. In articulating his analysis, the ALJ did not refer to, rely on, or adopt Dr. Gomez' statement regarding Claimant's credibility. Consequently, the undersigned **FINDS** Claimant's challenge on this ground to be equally without merit.

***3. Consideration of Claimant's Treatment Provider Opinions***

Claimant contends that the ALJ's decision is without substantial evidentiary support because he failed to properly review the medical findings made by Dr. Khawaja. Claimant emphasizes that Dr. Khawaja was her treating physician for sleep apnea, yet the ALJ "makes no reference to Dr. Khawaja's name" in the written decision. (ECF No. 10 at 14). Between June 2010 and September 2010, Claimant was treated for sleep apnea by Dr. McElroy and Dr. Khawaja, both of whom work for University Physicians & Surgeons. (Tr. at 295-326). Dr. McElroy was Claimant's primary care provider, (Tr. at 298), whereas Dr. Khawaja was the sleep specialist to whom Dr. McElroy referred Claimant for sleep studies and to manage her CPAP use. (Tr. at 317, 322, 324). While Dr. Khawaja's name does not specifically appear in the decision, in finding Claimant's sleep apnea to be a severe impairment, the ALJ cited to results of the sleep studies conducted by Dr. Khawaja. (Tr. at 15). There are only two other records on file associated with Dr. Khawaja, (315-16, 320-22), and they are entirely consistent with the findings of the sleep studies and the treatment records of Dr. McElroy, (Tr. at 295-301, 305-14), which the ALJ addressed throughout the decision. (Tr. at 15, 16, 18). Thus, the ALJ did sufficiently consider Dr. Khawaja's findings.

Claimant's next argument that the ALJ erred when he "failed to address the

diagnosis of claudication[4] by Dr. McElroy" lacks merit for two reasons. First, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). Although the ALJ did not explicitly discuss claudication, he did address Claimant's allegation of "pain in her lower extremities after walking for awhile," noting that the pain eased after she sat down and propped up her legs. The ALJ further pointed out that Dr. McElroy's August 10, 2010 medical examination did not reveal any abnormalities of Claimant's lower extremities. (Tr. at 18, 295, 296-97).

Second, Claimant misinterprets the relevant records. (Tr. at 302-04). Dr. McElroy's note that Claimant "currently has bilateral rest pain and bilateral claudication symptoms" was not a diagnosis, but rather a partial description of the indications for an ultrasound examination of Claimant's lower extremities. (Tr. at 302). The results of the ultrasound revealed that "there is no suggestion that the patient has any major atherosclerotic narrowing bilaterally." (Tr. at 304). The ultrasound did show that "there is some suggestion that there may be some narrowing in the thigh such as in the superficial femoral arteries on the right." (*Id.*). However, this single test revealing "some suggestion" of "some narrowing" hardly demonstrated that Claimant suffered from a severe impairment, or that it rendered her incapable of performing work-related activities.

Even accepting as true that Claimant's "claudication starts when the patient

[4] Claudication technically is not a disease, but is a symptom of a disease. "Most often, claudication is a symptom of peripheral artery disease, a potentially serious, but treatable circulation problem." © 1998-2012 Mayo Foundation for Medical Education and Research.

walks three blocks or so," (Tr. at 302-03), the ALJ's RFC assessment restricted Claimant to light work and imposed further postural limits of only occasionally climbing, balancing, stooping, crouching, kneeling, or crawling. (Tr. at 16). After considering Claimant's RFC assessment, the vocational expert testified that a person with Claimant's limitations could perform work at jobs existing in sufficient numbers in the national economy at light work level, as well as the sedentary level. (Tr. at 40-45). Accordingly, the undersigned **FINDS** that the ALJ's omission of explicit reference to "claudication" was not erroneous, and his RFC finding with respect to Claimant's leg pain was supported by substantial evidence.

**B. The Effect of Claimant's Impairments Prior to July 2010**

Claimant next contends that the ALJ failed to consider whether Claimant was disabled during "the period of time prior to the Claimant receiving treatment for her obstructive sleep apnea." (Pl.'s Br. at 15). Claimant reasons that because the ALJ determined her sleep apnea to be a severe impairment but rejected her disability on the basis that her condition had improved with CPAP use, he should have separately "addressed her limitations prior to the use of the CPAP." (*Id*.). Claimant's logic is flawed.

Under the regulations, the ALJ "need[s] evidence from acceptable medical sources to establish whether [a claimant has] a medically determinable impairment." 20 C.F.R. §§ 404.1513(a), 416.913(a). An impairment must be proven "by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. Although Claimant was diagnosed with "severe obstructive sleep apnea with optimal CPAP titration" in July 2010, (Tr. at 318), Claimant has failed to provide any evidence from

an acceptable medical source demonstrating the onset of severe sleep apnea prior to that time. The only reference from a medical source regarding the potential diagnosis of sleep apnea is contained in the record of Dr. Beard's examination on October 20, 2009. (Tr. at 196). Dr. Beard reported that Claimant had been "told that [obstructive sleep apnea] was possible through an ER physician." (Tr. at 197). However, there are no treatment notes, laboratory studies, test results, or clinical findings to corroborate this claim,. *See* 20 C.F.R. §§ 404.1513(b), 416.913(b) ("Medical reports should include . . . clinical findings [and] laboratory findings. . ."). Accordingly, Dr. Beard's tentative diagnostic impression of "possible sleep apnea" falls short of satisfying the requisite evidentiary showing to establish a medically determinable impairment.

Even assuming Dr. Beard's diagnostic impression sufficiently established Claimant's sleep apnea, substantial evidence supports the ALJ's finding that Claimant was not severely limited by her sleep apnea, even prior to using a CPAP machine. Dr. Beard's physical examination revealed no abnormalities in Claimant's vital signs, HEENT, neck, lungs, chest, cardiovascular system, abdomen, extremities, cervical spine, arms, hands, lumbosacral spine/hips, or neurological system.[5] (Tr. at 198-99). Based upon Dr. Beard's evaluation, Dr. Gomez issued his RFC opinion on Claimant's capacity to do work-related activities. (Tr. at 209). Claimant offers no medical or "other source" opinions prepared during the relevant time frame that contradict Dr. Gomez's RFC opinion. *See* 20 C.F.R. §§ 404.1513(d), §§ 416.913(d) ("[W]e may also use evidence from other sources to show the severity of your impairments and how it

[5] The mild pain and tenderness that Dr. Beard observed in Claimant's knees and ankles is consistent with the ALJ's finding that Claimant's "residuals of right ankle fracture" constitute a severe impairment. (Tr. at 15, 199).

affects your ability to work.”).

The undersigned also notes that Claimant originally alleged that the onset of her disability occurred in May 2006. (Tr. at 114, 119). Because she continued to work for two and a half years despite her alleged disability, Claimant subsequently amended her initial onset date to January 15, 2009 to reflect the date she ceased working, thereby becoming eligible for SSA and DIB. (Tr. at 32-33). Between September 2006 and January 2009, Claimant repeatedly sought treatment for various medical issues, including several foot, leg, and ankle injuries, foot swelling, and bronchitis. (Tr. at 211-94). Conspicuously absent from these records is any reference to difficulties relating to sleep. Even when questioned by health care providers about her past and current health conditions, Claimant never mentioned sleep apnea or sleepwalking until Dr. Beard’s examination of October 20, 2009.[6] (Tr. at 196, 242, 267-68, 279). The record shows that Claimant did not seek medical treatment for sleep problems until June 2010, more than 7 months after Dr. Beard’s evaluation, (Tr. at 298), a year and a half after Claimant’s amended disability onset date, (Tr. at 33), and over four years after her original alleged onset date. (Tr. at 32). If Claimant’s sleep apnea was so severe prior to June 2010 as to be disabling, it is reasonable to conclude that she would have mentioned it to the various health care providers who cared for her and would have sought treatment for the condition

[6] In a disability report prepared by Claimant sometime after May 2009, she claimed to have broken her leg in two places and shattered her ankle due to sleepwalking. (Tr. at 158). However, the Emergency Department record documenting treatment of Claimant’s leg fractures does not corroborate that claim. Instead, the record reflects that Claimant tripped and fell “near her home,” was a “previously healthy patient who was completely ambulatory before the accident,” and had no past medical history. (Tr. at 267-68). The records regarding Claimant’s foot fractures indicate that in September 2006, she fell out of bed and broke three metatarsal bones and on January 21, 2008, she hurt her ankle when her granddaughter fell on it. (Tr. at 212, 218). None of these records connect the falls and injuries to sleepwalking or sleep apnea.

sooner. The only evidence Claimant offers in support of her argument that she was disabled from sleep apnea prior to July 2010 are her own statements and a letter from a former supervisor indicating that prior to May 2007, Claimant occasionally fell asleep at work. The ALJ specifically found the "credibility of the claimant's testimony [to be] less than good," and the undersigned notes that the letter referenced a time period well before the disability onset date and after which Claimant continued to work. (Tr. at 18). "[I]n reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ." *Johnson v. Barnhart*, 434 F.2d 650, 653 (4th Cir. 2005) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)) (internal marks omitted). In light of the complete absence of medical findings substantiating the existence of severe sleep apnea prior to July 2010 and considering the ALJ's credibility analysis which specifically addressed Claimant's statements regarding sleep apnea, the undersigned **FINDS** that the ALJ adequately considered and accounted for the effects of Claimant's sleep apnea both prior to and after July 2010.

## VIII. Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Judgment on the Pleadings (ECF No. 11), **DENY** Plaintiff's Motion for Judgment on the Pleadings (ECF No. 10), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C.

Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, The parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** October 3, 2012.

Cheryl A. Eifert
United States Magistrate Judge